FELICE JOHN VITI, Acting United States Attorney (#7007)
CHRISTOPHER BURTON, Assistant United States Attorney (NV #12940)
Attorneys for the United States of America
20 North Main Street, Suite 208
St. George, Utah 84770
Telephone: (435) 634-4270
Christopher.burton4@usdoj.gov

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH

| | |
|---|---|
| IN THE MATTER OF THE APPLICATION OF THE UNITED STATES OF AMERICA FOR A SEARCH AND SEIZURE WARRANT FOR 384 W. BRITTLEBUSH WAY, IVINS, UTAH 84738 | **FILED UNDER SEAL**<br><br>**AFFIDAVIT**<br><br>Case No. 4:25-mj-00105 PK |
| IN THE MATTER OF THE APPLICATION OF THE UNITED STATES OF AMERICA FOR A SEARCH AND SEIZURE WARRANT FOR THE PERSON OF ROBERT WRIGHT EDWARDS | **FILED UNDER SEAL**<br><br>**AFFIDAVIT**<br><br>Case No. 4:25-mj-00106 PK |

## AFFIDAVIT IN SUPPORT OF APPLICATION

I, Lance Lange (Affiant), a Special Agent with the Federal Bureau of

Investigation, having been duly sworn, state as follows:

### INTRODUCTION AND AFFIANT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the

Federal Rules of Criminal Procedure for a warrant to search the premises known as 384

W. BRITTLEBUSH WAY, IVINS, UTAH 84738 ("Premises"), further described in

Attachment A-1, for the things described in Attachment B.  Additionally, this affidavit is submitted in support of an application to search the person of ROBERT WRIGHT EDWARDS, further described in Attachment A-2, for the things described in Attachment B.

2.    I am an investigative or law enforcement officer of the United States within the meaning of Title 18, United States Code, § 2510(7), and am empowered by law to conduct investigations of and to make arrests for federal criminal offenses.  I have been so employed by the FBI since March 2018.  I am currently assigned to the FBI Salt Lake City Division, St. George Resident Agency (RA), and assigned to investigate criminal violations, including enticement of minors, sexual exploitation of children, and other crimes against children.  As a special agent with the FBI, I have participated in and received training related to the investigation of crimes against children and crimes committed using the internet.  I have conducted many search warrants and led multiple investigations related to the commission of federal crimes.

3.    The facts set forth in this affidavit are based on my personal knowledge, knowledge obtained from other individuals during my participation in this investigation, including other law enforcement officers, interviews of cooperating witnesses, emails provided by witnesses, the review of documents and records related to this investigation, communication with others who have personal knowledge of the events and circumstances described herein, and information gained through my training and experience.  Because this affidavit is submitted for the limited purpose of establishing probable cause in support of the application for a search warrant, it does not set forth

each and every fact that your Affiant or others have learned during the course of the investigation.  Your Affiant has set forth only the facts that are believed to be necessary to establish probable cause that violations of 18 U.S.C. § 2252A(a)(1) (Transportation of Child Pornography); 18 U.S.C. § 2252A(a)(2) (Receipt/Distribution of Child Pornography); 18 U.S.C. § 2252A(a)(5) (Possession of Child Pornography), have been committed and that evidence of those offenses will be found at the locations identified in Attachments A-1 and A-2. There is, therefore, probable cause to search those locations for evidence identified in Attachment B.

## JURISDICTION

4.      This Court has jurisdiction to issue the requested warrant because it is a court of competent jurisdiction and venue as defined by Federal Rule of Criminal Procedure 41(b)(1).

## STATUTORY AUTHORITY

5.      This investigation concerns alleged violations of 18 U.S.C. § 2252A relating to material involving the sexual exploitation of minors.

a.      18 U.S.C. § 2252A(a)(1) prohibits knowingly mailing, transporting, or shipping child pornography in interstate or foreign commerce by any means, including by computer.

b.      18 U.S.C. § 2252A(a)(2) prohibits knowingly receiving or distributing any child pornography that has been mailed or shipped or transported in interstate or foreign commerce by any means, including by computer.

c.      18 U.S.C. § 2252A(a)(5)(B) prohibits a person from knowingly possessing any book, magazine, periodical, film, videotape, computer disk, or other material that contains an image of child pornography that has been mailed, shipped, or transported in interstate or foreign commerce by any means, including by computer, or that was produced using materials that have been mailed, shipped, or transported in interstate or foreign commerce by any means, including by computer.

## **DEFINITIONS**

6.      The following definitions apply to this Affidavit and Attachment B:

a.      "Child Erotica" means materials or items that are sexually arousing to persons having a sexual interest in minors but that are not necessarily, in and of themselves, obscene or that do not necessarily depict minors in sexually explicit poses or positions.

b.      "Child Pornography" includes any visual depiction of sexually explicit conduct where (a) the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct; (b) the visual depiction was a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaged in sexually explicit conduct; or (c) the visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct. *See* 18 U.S.C. § 2256(8).

c.      "Computer" refers to "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage

functions and includes any data storage facility or communications facility directly related to or operating in conjunction with such device." *See* 18 U.S.C. § 1030(e)(1).

d.    "Computer hardware" consists of all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data. Computer hardware includes any data-processing devices (including, but not limited to, central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including, but not limited to, keyboards, printers, video display monitors, and related communications devices such as cables and connections); as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including, but not limited to, physical keys and locks).

e.    "Computer passwords and data security devices" consist of information or items designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password (a string of alpha-numeric characters) usually operates what might be termed a digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software of digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

f.      "Computer-related documentation" consists of written, recorded, printed, or electronically stored material that explains or illustrates how to configure or use computer hardware, computer software, or other related items.

g.      "Computer software" is digital information that can be interpreted by a computer and any of its related components to direct the way it works. Computer software is stored in electronic, magnetic, or other digital form. It commonly includes programs to run operating systems, applications, and utilities.

h.      "Internet Protocol address" or "IP address" refers to a unique number used by a computer to access the internet. IP addresses can be dynamic, meaning that the Internet Service Provider (ISP) assigns a different unique number to a computer every time it accesses the internet. IP addresses might also be static, if an ISP assigns a user's computer a particular IP address that is used each time the computer accesses the internet.

i.      "Minor" means any person under the age of 18 years. *See* 18 U.S.C. § 2256(1).

j.      "Sexually explicit conduct" applies to visual depictions that involve the use of a minor, *see* 18 U.S.C. § 2256(8)(A), or that have been created, adapted, or modified to appear to depict an identifiable minor, *see* 18 U.S.C. § 2256(8)(C). In those contexts, the term refers to actual or simulated (a) sexual intercourse (including genital-genital, oral-genital, or oral-anal), whether between persons of the same or opposite sex; (b) bestiality; (c) masturbation; (d) sadistic or masochistic abuse; or (e) lascivious exhibition of the genitals or pubic areas of any person. *See* 18 U.S.C. § 2256(2)(A).

k.      "Visual depictions" include undeveloped film and videotape, and data stored on computer disk or by electronic means, which is capable of conversion into a visual image. *See* 18 U.S.C. § 2256(5).

l.      The terms "records," "documents," and "materials" include all information recorded in any form, visual or aural, and by any means, whether in handmade form (including, but not limited to, writings, drawings, painting), photographic form (including, but not limited to, microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, photocopies); mechanical form (including, but not limited to, phonograph records, printing, typing); or electrical, electronic or magnetic form (including, but not limited to, tape recordings, cassettes, compact discs, electronic or magnetic storage devices such as floppy diskettes, hard disks, CD-ROMs, digital video disks (DVDs), Personal Digital Assistants (PDAs), Multi Media Cards (MMCs), memory sticks, optical disks, printer buffers, smart cards, memory calculators, electronic dialers, Bernoulli drives, or electronic notebooks, as well as digital data files and printouts or readouts from any magnetic, electrical or electronic media.

m.      The term "illicit sexual conduct" means a sexual act (as defined in section 2246) with a person under 18 years of age that would be in violation of chapter 109A if the sexual act occurred in the special maritime and territorial jurisdiction of the United States; any commercial sex act (as defined in section 1591) with a person under 18 years of age; or production of child pornography (as defined in section 2256(8)).

## BACKGROUND ON COMPUTERS AND CHILD PORNOGRAPHY

7.      Computers and computer technology have transformed the way in which

individuals interested in child pornography interact with each other. Child pornography formerly was produced using cameras and film (either still photography or movies). The photographs required darkroom facilities and a significant amount of skill to develop and reproduce the images. There were definable costs involved with the production of pornographic images. To distribute these on any scale required significant resources. The photographs themselves were somewhat bulky and required secure storage to prevent their exposure to the public. The distribution of these wares was accomplished through a combination of personal contacts, mailings, and telephone calls.

8.      The development of computers has changed this. Computers basically serve four functions in connection with child pornography: production, communication, distribution, and storage.

9.      Child pornographers can now transfer photographs from a digital camera directly onto a computer. A device known as a modem allows any computer to connect to another computer through the use of telephone, cable, or wireless connection. Electronic contact can be made to literally millions of computers around the world.

10.      The computer's ability to store images in digital form makes the computer itself an ideal repository for child pornography. The size of the electronic storage media (commonly referred to as the hard drive) used in home computers has grown tremendously within the last several years. These drives can store thousands of images at very high resolution. Images can also be stored online or in the "cloud."

11.      The internet and its ubiquitous reach affords collectors of child pornography several different venues for obtaining, viewing and trading child

pornography in a relatively secure and anonymous fashion.

12.     Collectors and distributors of child pornography also use online resources to retrieve and store child pornography, including services offered by Internet Service Providers such as Google, Yahoo!, and Hotmail, among others. The online services allow a user to set up an account with a remote computing service that provides e-mail services as well as electronic storage of computer files in any variety of formats. A user can set up an online storage account from any computer with access to the Internet. Evidence of such online storage of child pornography is often found on the user's computer. Even in cases where online storage is used, however, evidence of child pornography can be found on the user's computer in most cases.

13.     As is the case with most digital technology, communications by way of computer can be saved or stored on the computer used for these purposes. Storing this information can be intentional, *i.e.*, by saving an e-mail as a file on the computer or saving the location of one's favorite websites in, for example, "bookmarked" files. Digital information can also be retained unintentionally, *e.g.*, traces of the path of an electronic communication may be automatically stored in many places (*e.g.*, temporary files or ISP client software, among others). In addition to electronic communications, a computer user's internet activities generally leave traces or "footprints" in the web cache and history files of the browser used. Additionally, a forensic examiner often can recover evidence suggesting whether a computer contains peer to peer software (P2P) (which is described in more detail in the following paragraphs), when the computer was sharing files, and some of the files which were uploaded or downloaded. Such information is

often maintained indefinitely until overwritten by other data.

**BACKGROUND** ███████

14.  ████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████.

**BACKGROUND** ███████

15.  ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████



## SPECIFICS OF SEARCH AND SEIZURE OF COMPUTER SYSTEMS

16.    Searches and seizures of evidence from computers commonly require agents to download or copy information from the computers and their components or seize most or all computer items (computer hardware, computer software, and computer related documentation) to be processed later by a qualified computer expert in a laboratory or other controlled environment. This is almost always true because of the following:

a.    Computer storage devices (like hard disks, diskettes, tapes, laser disks, magneto opticals, and others) can store the equivalent of thousands of pages of information. Especially when the user wants to conceal criminal evidence, he or she often stores it in random order with deceptive file names. This requires searching authorities to examine all the stored data to determine whether it is included in the warrant. This sorting process can take days or weeks, depending on the volume of data stored, and it would be generally impossible to accomplish this kind of data search on site; and

b.    Searching computer systems for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. The vast

array of computer hardware and software available requires even computer experts to specialize in some systems and applications, so it is difficult to know before a search which expert should analyze the system and its data. The search of a computer system is an exacting scientific procedure which is designed to protect the integrity of the evidence and to recover even hidden, erased, compressed, password-protected, or encrypted files. Since computer evidence is extremely vulnerable to tampering or destruction (which may be caused by malicious code or normal activities of an operating system), the controlled environment of a laboratory is essential to its complete and accurate analysis.

17.     To fully retrieve data from a computer system, the analyst needs all magnetic storage devices as well as the central processing unit (CPU). In cases involving child pornography where the evidence consists partly of graphics files, the monitor(s) may be essential for a thorough and efficient search due to software and hardware configuration issues. In addition, the analyst needs all the system software (operating systems or interfaces, and hardware drivers) and any applications software which may have been used to create the data (whether stored on hard drives or on external media).

18.     In addition, there is probable cause to believe that the computer and its storage devices, the monitor, keyboard, and modem are all instrumentalities of the crime(s), within the meaning of 18 U.S.C. § 2252A and should all be seized as such.

## SEARCH METHODOLOGY TO BE EMPLOYED

19.     The search procedure of electronic data contained in computer hardware, computer software, and/or memory storage devices may include the following techniques (the following is a non-exclusive list, as other search procedures may be used):

a.      examination of all of the data contained in such computer hardware, computer software, and/or memory storage devices to view the data and determine whether that data falls within the items to be seized as set forth herein;

b.      searching for and attempting to recover any deleted, hidden, or encrypted data to determine whether that data falls within the list of items to be seized as set forth herein (any data that is encrypted and unreadable will not be returned unless law enforcement personnel have determined that the data is not (1) an instrumentality of the offenses, (2) a fruit of the criminal activity, (3) contraband, (4) otherwise unlawfully possessed, or (5) evidence of the offenses specified above);

c.      surveying various file directories and the individual files they contain;

d.      opening files in order to determine their contents;

e.      scanning storage areas;

f.      performing key word searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are likely to appear in the evidence described in Attachment A; and/or

g.      performing any other data analysis technique that may be necessary to locate and retrieve the evidence described in Attachment B.

## INTRODUCTION REGARDING PREFERENTIAL SEXUAL OFFENDERS AND THE INTERNET

20.      Based upon my experience and discussions with other law enforcement officers, your Affiant has learned that there are many types of preferential sex offenders.

Some of these offenders have a primary sexual interest in children and are often referred to as pedophiles. This affidavit deals with these types of offenders. Preferential sex offenders receive sexual gratification from actual contact with children and/or from fantasy involving children, through the use of photographs and/or digital images that can be stored on computer hard drives and other types of digital recordable media (floppy diskettes, writable compact discs, writable DVDs, etc.). Your affiant is aware that these types of sex offenders often collect sexually explicit material consisting of photographs, video tapes, books, slides, and digital images, which they use for their own sexual gratification and fantasy and to show children in an attempt to lower the child's inhibitions.

21. Your Affiant has learned that the internet has provided preferential sex offenders with a virtually anonymous venue in which they can meet other people with the same or similar sexual interests. Preferential sex offenders also use the computer to electronically exchange pictures of children or of adults engaged in sexual activity with children. These images are readily and easily available on the internet. These images can then be downloaded and stored on the computer or other forms of digital recordable media such as CDs, DVDs, USB thumb drives, floppy disks, etc., and then viewed on the computer monitor at any time. Preferential sex offenders will also participate in chat rooms in order to communicate with other like-minded individuals and to meet children. This communication serves to legitimize their conduct and beliefs. Your affiant also knows from training and experience that preferential sex offenders who collect child pornography rarely, if ever, dispose of their sexually explicit materials and may go to

great lengths to conceal and protect from discovery, theft, and damage to their collections of child pornography. I also know that these individuals typically maintain their child pornography collections in the privacy and security of their homes, or other secure location to which they have common access.

22.    Individuals with a sexual interest in children can and often do use social media applications to communicate with other individuals with a sexual interest in children. Your affiant has worked several cases where individuals with a sexual interest in children have used social media applications to obtain, distribute, and manufacture child pornography.

23.    Collectors and distributors of child pornography often use online resources to retrieve, share, and store child pornography. Non-pornographic, seemingly innocuous images of minors are often found in accounts that also contain child pornography, or that is used to communicate with others about sexual activity or interest in children. Such images are useful in attempting to identify actual minors depicted in child pornography images found during the execution of a search warrant. In certain cases, such images may also assist in determining the origins of a particular child pornography image or series of images. Further, the online services allow a user to set up an account with a remote computing service that provides email services as well as electronic storage of computer files in any variety of formats. A user can set up an online storage account from any computer with access to the internet. These online storage accounts are often free but can involve a charge. A subscriber assigned a free online storage account frequently can set up such accounts by providing limited identifying information. Any information provided

is frequently fictitious in an attempt to preserve the anonymity of the user. Consequently, even if it is known that a collector or distributor of child pornography is a subscriber of a free online storage service, the service provider frequently will have no records in that subscriber's name. Instead, the online service will only be able to identify files, including child pornography, that are associated with a "login," or unique, user-created identity the subscriber uses to "log on" to the online service. Such an online storage account is particularly useful to a collector or distributor of child pornography. Such a subscriber can collect, store, view and distribute electronic images, including child pornography, directly from the online service. Consequently, the illegal files have minimal contact with the subscriber's home computer.

24.    The subscriber can also manipulate the files on an online storage service from any computer connected to the internet. Nonetheless, evidence of an online storage account is often found on a home computer of a user subscribing to such a service. Evidence of an online storage account may take the form of passwords located in encrypted, archived, or other files on the user's home computer. Other evidence can also be found through unique software that may exist on a user's home computer that has been developed by the online storage service. This unique software will frequently contain evidence not only of the existence of such accounts, but the login and password.

25.    Your Affiant knows from training and experience that persons trading in, receiving, transporting, distributing, or possessing images involving the sexual exploitation of children or those interested in the firsthand sexual exploitation of children often communicate with others through correspondence or other documents (whether

digital or written) which could tend to identify the origin of the images as well as provide evidence of a person's interest in child pornography or child sexual exploitation.

26. Your Affiant knows from training and experience that digital evidence is not limited to computers. Your affiant has been involved in cases where persons engaged in the type of crime under investigation can access the internet, display images reflecting their interests or participation in the crime and communicate with other individuals with the same interests using digital storage devices to include cellular telephones, email devices, and personal digital assistants. These devices are frequently found to contain chat communications in the form of short message service (SMS) messages as well as enabling internet and digital cellular network access.

27. Your Affiant knows from training and experience that the complete contents of online accounts may be important to establishing the actual user who has dominion and control of an online account at a given time. Online accounts may be registered in false names or screen names from anywhere in the world with little to no verification by the service provider. They may also be used by multiple people. So, information stored in connection with an online account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation. This helps establish and prove each element of the crime or alternatively, may exclude the innocent from further suspicion.

28. In my training and experience, an online user's account activity, IP log, location information, search history, stored electronic communications, and other data retained by providers, can indicate who has used or controlled an online account or can

provide context for the crime under investigation. This can include evidence of motive and intent to commit a crime (e.g., communications about planning crimes), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement). For example, profile contact information, direct messaging logs, shared photos and videos, and captions (and the data associated with the foregoing, such as geo-location, date and time) may be evidence of who used or controlled the account at a relevant time.

29.     Further, account activity, especially when paired with other evidence of the crime, can show how and when the account was accessed or used, and may reflect a user's motive or state of mind when doing so. For example, as described herein, providers log the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Especially when considered in context with other evidence, such information allows investigators to understand the geographic and chronological context of an account's access, use, and events relating to the crime under investigation. Location data also helps with this. Providers allow users to "tag" their location in posts to locate each other. This geographic and timeline information may tend to either inculpate or exculpate the account user or other suspects.

30.     Your Affiant knows from training and experience criminals discussing their criminal activity may use slang, short forms (abbreviated words or phrases such as "lol"

to express "laugh out loud"), or code words (which require entire strings or series of email conversations to determine their true meaning) when discussing their crimes. They can also discuss aspects of the crime without specifically mentioning the crime involved. In the electronic world, it is even possible to use pictures, images, and emoticons (images used to express a concept or idea such as a happy face inserted into the content of an email or the manipulation and combination of keys on the computer keyboard to convey an idea, such as the use of a colon and paren ":)" to convey a smile or agreement) to discuss matters. Keyword searches would not account for any of these possibilities, so actual review of the contents of an online account by law enforcement familiar with the identified criminal activity is necessary to find all relevant evidence within the account.

31.    Your Affiant recognizes the prudence requisite in reviewing and preserving in its original form only such records applicable to the violations of law described in this affidavit and in Attachment B, to prevent unnecessary invasion of privacy and overbroad searches. Your affiant advises it would be impractical and infeasible for the Government to review records produced by a Service Provider and keep only such records as the Government finds to be related to the offenses described herein and in Attachment B during a single analysis.

32.    Your Affiant has learned through practical experience that various emails often have unknown probative value and linkage to other pieces of evidence in the investigation until they are considered within the fluid, active, and ongoing investigation of the whole. In other words, the weight of each individual piece of the data fluctuates based upon additional investigative measures undertaken, other documents under review

and incorporation of evidence into a consolidated whole. Analysis is content-relational, and the importance of any associated data may grow whenever further analysis is performed. The full scope and meaning of the whole of the data is lost if each piece is observed individually, and not in sum. Due to the interrelation and correlation between communication threads and contents of accounts, and any respective attachments, looking at one piece of information may lose its full evidentiary value if it is related to another piece of information, yet its complement is not preserved along with the original. Therefore, to obtain the full picture and meaning of the data from the information sought in Attachments A and B of this application, and to maintain its admissibility at trial, the Government needs to maintain access to all the resultant data. The completeness and potential of probative value of the online accounts and data must be assessed within the full scope of the investigation. As with all evidence, the Government will obtain the contents of the account(s) in its custody and control, without alteration.

## THE INVESTIGATION

33.     On or about March 29, 2021,



34.     When accessed, this link directed ▮▮▮▮ to a ▮▮▮▮ meeting room where child sexual abuse material (CSAM)[1] was being streamed on the main screen by a ▮▮▮▮ participant user "▮▮▮▮▮▮▮▮" Also visible on the screen were the participants of the meeting. Many of these participants had cameras associated with their devices turned on and were visible through a series of small windows on the side of the screen. Several of the participants whose cameras were turned on could be seen fully or partially naked and some were visibly masturbating.  Additionally, there was also a chat function within the meeting that allowed the users to communicate with each other. The ▮▮▮▮ recorded the ▮▮▮▮ meeting.

35.     One such participant of this meeting was an individual with the display name ▮▮▮▮ ▮▮▮▮ first appeared naked laying on a bed in a position that suggested that his hand was on or near his pubic area, which was initially off-camera around 11:28 of the session. At the time that ▮▮▮▮ first appeared on the OCE's recording, the video that was streaming to participants through the share-screen function depicted what appeared to be a ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. At around 11:46 of the recording, ▮▮▮▮ appeared to turn his camera off and the window that previously depicted him on the bed changed to a profile picture of a person who was visually similar to the naked male observed in the video. During the remainder of the video that the ▮▮▮▮ captured, ▮▮▮▮ switched between having his camera on (which provided a real-time view of him) and this profile image.

---

[1] For purposes of this affidavit, the term "CSAM" is intended to by synonymous with "child pornography" as defined in 18 U.S.C. 2256(8).

 penis eventually became visible in the viewing window and when he appeared in the viewing window in real time, he appeared to be looking toward the camera. Also visible for a limited time were two other adult men in the same room as ▮▮▮▮

36.    FBI served legal process on ▮▮▮ on May 5, 2021, seeking information about the participants in the meeting during the time the ▮▮▮ was present. In response, On May 11, 2021, ▮▮▮ provided information about the identified users, including the following information for ▮▮▮

        User Name: ▮▮▮
        Email: ▮▮▮▮▮▮▮▮▮▮▮
        User ID: ▮▮▮▮▮▮
        Platform: ▮▮▮▮▮▮▮▮▮
        External IP: ▮▮▮▮▮▮

37.    Subsequently, the FBI served legal process to Apple, Inc. on July 13, 2021, requesting information related to email address ▮▮▮▮▮▮▮▮▮▮▮. On August 4, 2021, Apple produced the following pertaining to the Apple account associate with that email:

        Apple ID: ▮▮▮▮▮▮▮▮
        First name: Robert
        Last name: Edwards
        Address: ▮▮▮▮▮▮▮▮▮▮▮▮

38.    Through open-source research on the Internet, including newspapers and social media websites, the FBI obtained photographs of Robert Edwards, who resided at ▮▮▮▮▮▮▮▮▮▮▮, and goes by "Bobby." The photographs resemble the images of ▮▮▮ User ▮▮▮ that the ▮▮▮ captured while in the recorded

████ meeting. In addition, ████████ ████ are consistent with the name Bobby Edwards.  Because of this, your Affiant believes ████ user ████ is Robert Edwards.

39.    Information provided by ████ also indicated that Edwards accessed the meeting from an IP address assigned to a location in Puerto Vallarta, Mexico. On February 4, 2019, Edwards posted on his personal public Facebook account "Bobby Edwards," an advertisement for an Airbnb Condo to rent in Puerto Vallarta Mexico, located at ████████████████████████████. In the post, Edwards stated: "We recently spent a few weeks here getting this fabulous rental place ready and I am very proud of it.  Yes. That is the ocean you see "smile face emoji" perfect location in Puerto Vallarta, Mexico…."  Edwards also posted photos of the interior of the rental property, which showed the condo had two bedrooms. The décor of both of the bedrooms was consistent with the bedroom Edwards was in during the real time video he displayed in the recorded ████ call.  Specifically, the bedroom Edwards was in during the ████ call and the bedrooms identified in the Airbnb ad both show distinct wood bedframes.

40.    Based on travel records obtained from the Department of Homeland Security, Edwards traveled to Puerto Vallarta 20 times between January 14, 2020, and July 20, 2025.  Travel records also indicate that Edwards traveled from Salt Lake City to Puerto Vallarta on March 9, 2021, and returned from Puerto Vallarta through Phoenix on March 30, 2021, which means that Ewards was in Puerto Vallarta, Mexico on March 29, 2021, during the time of the ████ meeting.

41.    On December 16, 2021, FBI served additional legal process to ████ On December 28, 2021, in response to the legal request, ████ provided information about

Edwards's activities on ██████ other than his participation in the March 29, 2021 meeting. This information indicated that Edwards used names on ██████ other than ██████ including █████████████████████████████████ and as of November 2024, █████████ [2] It also indicated that Edwards accessed other ██████ meetings from locations in Utah, as well as Nevada and Texas. Specifically, Edwards accessed 14 ██████ meetings utilizing IP address █████████, between February 7, 2021, and August 11, 2021. Edwards used the username ██████ to access those ██████ meetings. Investigators were able to determine that the IP address for those 14 ██████ meetings belonged to TDS Broadband Services, LLC ("TDS"). Investigators submitted legal process to TDS requested information regarding the IP address. On December 28, 2021, TDS produced the following information for IP address █████████:

> Account name: Robert Edwards
> Service and Billing address: ███████████████████████

42.    Edwards also accessed ██████ meetings twice utilizing IP address █████████, on March 1 and 2 of 2021. Edwards used the username ██████ for these ██████ meeting as well. This IP address is likewise owned by TDS, which provided the following information for IP address █████████ pursuant to legal process:

> Account name: ███████████
> Service and Billing address: ████████████████████████

43.    ██████ could not provide any content from the meetings which Edwards attended as ██████ does not retain that information. However, based on additional

---

[2] Based on my training and experience, I know "██ █████████████ .

investigation, it appears Edwards has continued to participate in ▮▮ meetings during which CSAM was streamed.

44.    On or about May 12, 2025, FBI learned that Edwards was suspected of purchasing CSAM through his ▮▮ account. Investigators submitted a subpoena to ▮▮ requesting information related to those transactions. On May 22, 2025, ▮▮ responded and provided supporting documentation. That supporting documentation shows that Edwards used his subscribed ▮▮ account number ▮▮ to conduct four separate transactions. ▮▮ suspected the transactions related to the purchase of CSAM. The transactions are described in more detail below.

a.    On January 9, 2025, Edwards's ▮▮ account was used to send $20.00 to ▮▮ with the payment caption "▮▮." The IP address used to conduct this transaction was ▮▮, which was owned by Centrytel Internet and associated with LUMEN Technologies. In response to a subpoena, LUMEN Technologies responded on August 25, 2025, with subscriber and internet connection information showing the associated IP address user ID was "▮▮" using MAC address: ▮▮. The IP was assigned to Bobby Edwards, address ▮▮ phone number ▮▮, email address ▮▮, and the account was created on May 9, 2024.

b.    On January 3, 2025, Edwards's ▮▮ account was used to send $30.00 to ▮▮ with the payment caption ▮▮." The IP address used to conduct this transaction was ▮▮, which was associated with T-Mobile. A subpoena was served on T-Mobile for the subscriber information associated

with the IP address.  On August 29, 2025, T-Mobile responded that they were unable to determine the subscriber on data detailed in a IPv4[3] address. However, through a subpoena served on T-Mobile on September 8, 2025, it was confirmed that the phone number listed on Edwards's ▮▮▮▮ account and Centrytel ISP account (▮▮▮▮▮▮▮▮) was a current T-Mobile phone number and had been in service since December 9, 2024.

      c.      On March 26, 2023, Edwards's ▮▮▮▮ account was used to send $260.21 to ▮▮▮▮▮▮ with the payment caption "send a sample." The IP address used to conduct this transaction was ▮▮▮▮▮▮, which was registered to Cox Communications ISP. A subpoena was served to Cox Communications for information related to the IP address. On August 19, 2025, in response to the subpoena, Cox Communications responded that the subscriber information for that IP address at the time of the transaction was Entourage Spa Club, located in Las Vegas, NV.

      d.      On March 14, 2023, Edwards's ▮▮▮▮ account was used to send $100.23 to ▮▮▮▮▮▮▮▮ with the payment caption ▮▮▮▮▮▮ The IP address used to make this transaction was ▮▮▮▮▮▮, which belongs to Kayenta Technologies ISP.  A subpoena was served on Kayenta Technologies requesting the subscriber information for the IP address. On August 18, 2025, in response to the subpoena, Kayenta Technologies replied that Kayenta Technologies only retains IP address records for six months and the responsive information had been purged. However, Kayenta

---

[3] IPv4 and IPv6 are both Internet Protocol versions, but IPv6 was developed to address the limited 32-bit address space of IPv4 with a 128-bit address space. IP address ▮▮▮▮▮▮ is an example of an IPv4 IP address.

Technologies further explained that based on the IP address's subnet, the IP address would have been located in zip code 84738 and most likely have been somewhere in the western part of Ivins.  The Premises is located in zip code 84738 and is in the western part of Ivins.

45.    All four transactions were flagged by ▮▮▮▮ for the suspected selling and purchase of CSAM. Between June 4, 2025, and August 12, 2025, the FBI communicated with ▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ for further information regarding the flagged transactions.

46.    ▮▮▮▮ informed that a review of the private messaging over ▮▮▮ reference the suspicious transactions revealed a message sent by the ▮▮▮ account in the name of "▮▮▮▮▮," to Edwards on January 6, 2025, which stated:



47.    This message was sent after the ▮▮▮▮ account was limited by ▮▮▮ due to suspected illicit activity. Based on my training and experience, the message suggests an attempt by the ▮▮▮▮ account holder to circumvent account limitations and continue with the suspected illicit activity.

48.     Additionally, ████ provided a review of the January 3, 2025 illicit transaction from Edwards's ████ account to ████ detailed above. ████ described the accounts as being flagged based on multiple transaction notes, ████ chat messages, and payment referencing the sale of videos using the file hosting service ████,[4] which were described by ████ as featuring explicit sexual activity conducted between "boys and dads."  As an example, ████ identified a transaction with a note stating "████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████ ████" ████ did not specify which accounts sent or received this message but it was provided as part of their investigation into the suspicious transactions detailed above.

49.     Further information from ████ revealed that ████ had been identified as the brother of ████, or that the suspected ████ account was linked with ████.  The ████ account had the same phone numbers and email addresses as some of ████ accounts that had been identified by law enforcement as associated with the distribution and selling of CSAM.  According to ████ and United Kingdom law enforcement, ████ was arrested on January 8, 2025, for the sale of CSAM.

---

[4] ████ is a cloud storage service known for its user-controlled, zero-knowledge encryption. Only the end users, not the company, hold the decryption keys to the files. It offers features like file storage and sharing, real-time chat, audio and video calls, and a desktop app for syncing files across devices. ████ offers a generous amount of free storage. In my training and experience, ████ is often used by CSAM collectors and traffickers.

50.     On August 18, 2025, and September 25 ,2025, the FBI communicated with investigators from the Norfolk Constabulary in the UK from the Safeguarding Children Online Unit.  The UK law enforcement officers (LEO) confirmed that on July 28, 2025, ███████ was convicted of eight counts of distributing indecent images of a child, two counts of making indecent images of a child, and seven counts of blackmail and sentenced to four-and-a-half years in prison.  As part of the UK investigation, LEOs learned that ████ would avoid detection, in part, by moving from hotel to hotel, changing phone numbers and cell phones often, and using a wide variety of aliases, to include that of family members such as ████████.  UK LEOs also determined that ██████ owned the email address ██████████████████, which was associated with the ████████ ██████ account discussed above. UK LEOs identified █████ ██████ account as using telephone number █████████, with a username of "████████ ███████ phone number ending in ████ is also the telephone number associated with the ██████████ account.

51.     According to UK LEOs, ███████ mode of operation was to advertise CSAM on ████████.[5] When someone expressed interest in purchasing the advertised CSAM, ██████ would send a ██████ link on ████████ to receive payment, as well as a link with access to the purchased CSAM.  UK LEOs also determined that ██████ would

---

[5] ████████ is a free, cloud-based instant messaging and social media app that allows users to exchange messages, make voice and video calls, share files, and join channels for broadcasting content to large audiences. Founded by Russian tech entrepreneurs, it emphasizes cloud-based chat syncing across multiple devices and offers enhanced encryption.

sometimes coordinate ▮▮ conference calls in which CSAM was streamed or presented to individuals with granted access.

52.   Additionally, UK LEOs reviewed ▮▮▮ conversations on ▮▮▮ mobile device. UK LEOs were able to identify a private chat with "▮▮▮," the same username that Edwards used on his ▮▮ platforms and the name he was called in ▮▮ transaction messages. Although "▮▮▮" was listed as an account with which ▮▮ had exchanged messages over Telegram, there was no content available on ▮▮ device. Based on my training and experience, it is likely that the chat content had been wiped by either an in-built timer through the ▮▮▮ application or manually by one of the users. Even though there was no chat content, the fact that "▮▮▮" was listed as a user in ▮▮ private chat list, there would have been ▮▮▮ communications between ▮▮ and Edwards.

53.   The ▮▮▮ account for "▮▮▮ had a profile picture. The profile picture depicts a nude adult Caucasian male. The face and/or head of the adult male is not included in the photo. Additionally, the ▮▮▮ profile page for "▮▮▮," includes those 'groups' that "▮▮▮" participated in. Review of those groups shows that "▮▮▮" was part of the same ▮▮ PNP Links group as ▮▮ which was the group whereby ▮▮ shared ▮▮ links in which CSAM was being shared. Depicted below are screen shots taken by UK LEOs of ▮▮▮ mobile phone and ▮▮▮ account, demonstrating his *modus operandi* and use of the ▮▮▮ account.





54.     Based on the above, there is probable cause to believe that Edwards has

received and possessed CSAM since at least 2021 and continuing through this year.

There is also probable cause to believe Edwards has used a number of electronic services, including ████ ██████ and ████████ to receive and possess CSAM. There is also probable cause to believe that evidence of Edwards's purchase and possession of CSAM over the internet will be located on electronic devices to which he has access, including those on his person and in the Premises.

55.    According to database checks conducted on August 18, 2025, Edwards's address was listed as ████████████████████████████████████ (Premises). This is the same address listed under Edwards's subscriber information for ██████ TDS Broadband, LUMEN, ██████ and ████████. Additionally, the vehicle registered to Edwards, a 2021 Audi E-Tron, bearing license plate number 3AJ375, was observed parked at the Premises on August 18, 2025. On October 23, 2025, a 2024 Toyota Tundra bearing Utah license plate number 5AY193 was seen parked outside the Premises. A database search from the DMV on the vehicle was conducted and the owner on the registration was listed as Edwards with residential address listed as the Premises. On October 24, 2025, Edwards was seen outside the Premises, conducting maintenance on the 2024 Toyota Tundra. The garage door of the Premises was open and Edwards's other registered vehicle, the Audi E-Ton, was seen parked inside the garage. ████████

56.    The warrant I am applying for would permit law enforcement to obtain from certain individuals the display of physical biometric characteristics (such as fingerprint, thumbprint, or facial characteristics) in order to unlock devices subject to search and seizure pursuant to this warrant. I seek this authority based on the following:

a.	I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners and facial recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

b.	If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

c.	If a device is equipped with a facial recognition feature, a user may enable the ability to unlock the device through his or her face. For example, Apple offers a facial recognition feature called "Face ID."  During the Face ID registration process, the user holds the device in front of his or her face. The device's camera then analyzes and records data based on the user's facial characteristics. The device can then be unlocked if the camera detects a face with characteristics that match those of the registered face.

Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Face ID.

d.      In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

e.      As discussed in this affidavit, based on my training and experience I believe that one or more digital devices will be found during the search. The passcode or password that would unlock the device(s) subject to search under this warrant is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the device(s), making the use of biometric features necessary to the execution of the search authorized by this warrant.

f.      I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Touch ID when (1) more than 48 hours has elapsed since the device was last unlocked or (2) when the device has not been unlocked using a

fingerprint for 4 hours *and* the passcode or password has not been entered in the last 156 hours. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

g.    In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device. However, in my training and experience, that person may not be the only user of the device whose physical characteristics are among those that will unlock the device via biometric features, and it is also possible that the person in whose possession the device is found is not actually a user of that device at all. Furthermore, in my training and experience, I know that in some cases it may not be possible to know with certainty who is the user of a given device, such as if the device is found in a common area of a premises without any identifying information on the exterior of the device. Thus, it will likely be necessary for law enforcement to have the ability to require any individual, who is found at the Premises and reasonably believed by law enforcement to be a user of the device, to unlock the device using biometric features in the same manner as discussed above.

57.    Due to the foregoing, if law enforcement personnel encounter a device that is subject to search and seizure pursuant to this warrant and may be unlocked using one of the aforementioned biometric features, the warrant I am applying for would permit law enforcement personnel to (1) press or swipe the fingers (including thumbs) of any

individual, who is found at the Premises and reasonably believed by law enforcement to be a user of the device, to the fingerprint scanner of the device; (2) hold the device in front of the face of those same individuals and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search its contents as authorized by this warrant.

## CONCLUSION

58.      Based on the forgoing, I request that the Court issue the proposed search warrant.  This Court has jurisdiction to issue the requested warrant under Federal Rule of Criminal Procedure 41(b)(1).  Accordingly, by this Affidavit and Warrant, I seek authority for the government to search the property described in A-1 and the person described in A-2 for all of the items specified in Attachment B (attached hereto and incorporated by reference herein) to the Warrant, and specifically to seize all of the data, documents, records, and evidence identified in Attachment B.

_____
Lance Lange
Special Agent
Federal Bureau of Investigation

SUBSCRIBED AND SWORN before me this ____30th____ day of October, 2025.

_____
Paul Kohler
United States Magistrate Judge

**ATTACHMENT A-1**
(Property to Be Searched

384 W. BRITTLEBUSH WAY, IVINS, UTAH 84738 (the "Premises" for

purposes of Attachment B), which is depicted below, and all computers, electronic

devices, and storage found within the Premises.  The Premises to be searched, includes

any appurtenances to the real property, vehicles on the physical property, and any

exterior storage units.





## ATTACHMENT A-2
(Person to Be Searched)

An individual named ROBERT EDWARDS, who is depicted in the image below,

and computers, cellular telephones, electronic devices, and storage media found upon him

and within his area of reach:



## ATTACHMENT B

*Physical Items to Be Seized and Searched*

As used below, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies). The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.  The term "storage medium" includes any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

The property and person described in Attachment A-1 and A-2, and the related electronic devices may be searched for the following items and records that relate to violations of 18 U.S.C. § 2252A(a)(1) (Transportation of Child Pornography); 18 U.S.C. § 2252A(a)(2) (Receipt/Distribution of Child Pornography); 18 U.S.C. § 2252A(a)(5) (Possession of Child Pornography) (the "Target Offenses"):

1.      Any and all material depicting child pornography, any sexual conduct regardless of whether it is between adult(s) and children, or between children, child erotica; any images, visual recording, digital imagery, sketches, drawings, or other media depicting

or portraying lewd or lascivious exhibition of children's genitalia; sexually suggestive poses involving children; or any type of sexually explicit conduct involving children, as defined in Title 18, United States Code, Section 2256(8). Any and all audio recordings involving children engaging in sexual acts, whether alone, with another child or children, or with an adult or adults.

2. Any and all records and materials, in any format and media (including, but not limited to, envelopes, letters, papers, e-mail, chat logs and electronic messages), pertaining to the possession, transportation, receipt or distribution of visual depictions of minors engaged in sexually explicit conduct, as defined in Title 18, United States Code, Section 2256.

3. Any and all records and materials, in any format and media (including, but not limited to, e-mail, chat logs and electronic messages) identifying persons transmitting through interstate or foreign commerce, including via computer, any visual depiction of minors engaged in sexually explicit conduct, as defined in Title 18, United States Code, Section 2256.

4. Records of communication (as might be found, for example, in digital data files) between individuals concerning the topic of child pornography, the existence of sites on the Internet that contain child pornography or who cater to those with an interest in child pornography, as well as evidence of membership, subscription or free membership, in online clubs, groups, services, or other Internet sites that provide or make accessible child pornography to its members and constituents.

5. Evidence of any online storage, e-mail or other remote computer storage subscription to include unique software of such subscription, user logs or archived data that

show connection to such service, and user login and passwords for such service.

6.      Any and all buddy lists, correspondence, or text messages in whatever media and format pertaining to Group E-Mails which relate to child exploitation or child pornography.

7.      Images and videos of children in non-sexually explicit poses or scenes, located in electronic, digital, or printed formats, which are necessary for comparison purposes of any visual depiction of minors engaged in sexually explicit conduct, as defined in Title 18, United States Code, Section 2256.

8.      Receipts or financial records relating to the Target Offenses.

9.      Computers or electronic devices, including desktop computers, laptop computers, telephones, cellular telephones, tablets, pagers, and personal digital assistants capable of connecting to the internet ("Subject Devices"), and any names, addresses, telephone numbers, and codes stored therein, and indicia of ownership of these communications devices, including boxes, manuals, chargers, receipts, and phone bills.

10.     Any and all computer software, including programs to run operating systems, applications (like word processing, graphics, or spreadsheet programs), utilities, compilers, interpreters, and communications programs.

11.     Any computer-related documentation, which consists of written, recorded, printed or electronically stored material that explains or illustrates how to configure or use computer hardware, software or other related items.

12.     Records evidencing occupancy or ownership of the premises described above, including, but not limited to, utility and telephone bills, mail envelopes, or addressed

correspondence.

13.     Evidence of who used, owned, or controlled Subject Devices at the time the evidence of the Target Offenses was created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence.

14.     Evidence of software that would allow others to control the Subject Devices, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software.

15.     Evidence of the lack of such malicious software.

16.     Evidence of the attachment to the Subject Device of other storage devices or similar containers for electronic evidence.

17.     Evidence of counter forensic programs (and associated data) that are designed to eliminate data from the Subject Devices.

18.     Passwords, encryption keys, and other access devices that may be necessary to access the Subject Devices.

19.     Documentation and manuals that may be necessary to access devices or to conduct a forensic examination of the Subject Devices.

20.     Contextual information necessary to understand the evidence described in this attachment.

During the execution of the search of the Premises described in Attachment A-1, law enforcement personnel are authorized to (1) press or swipe the fingers (including thumbs) of any individual, who is found at the Premises and reasonably believed by law enforcement to be a user of the device, to the fingerprint scanner of the device(s) found at the Premises; (2) hold a device(s) found at the Premises in front of the face those same individuals and activate the facial recognition feature; and/or (3) hold the device(s) found at the Premises in front of the face of those same individuals and activate the iris recognition feature, for the purpose of attempting to unlock the device(s) in order to search the contents as authorized by this warrant.

During the execution of the search of the person described in Attachment A-2, with respect to any device found on the individual or which law enforcement reasonably believes is used by the individual, law enforcement personnel are authorized to (1) press or swipe the fingers (including thumbs) of the individual to the fingerprint scanner of the device(s); (2) hold the device(s) in front of the face of the individual and activate the facial recognition feature; and/or (3) hold the device(s) in front of the face of the individual and activate the iris recognition feature, for the purpose of attempting to unlock the device(s) in order to search the contents as authorized by this warrant.

With respect to the search of the information provided pursuant to this warrant, law enforcement personnel will make reasonable efforts to use methods and procedures that will locate and expose those categories of files, documents, communications, or other electronically stored information that are identified with particularity in the warrant while minimizing the review of information not within the list of items to be seized as set forth

herein, to the extent reasonably practicable.  If the government identifies any seized communications that may implicate the attorney-client privilege, law enforcement personnel will discontinue its review and take appropriate steps to segregate all potentially privileged information so as to protect it from substantive review.  The investigative team will take no further steps regarding any review of information so segregated, absent further order of the court.  The investigative team may continue to review any information not segregated as potentially privileged.